482 S.E.2d 687

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Betty Jane SMITH, Defendant Below, Appellant.**

**No. 23312.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 24, 1996.

Decided Dec. 19, 1996.

Daynus Jividen, Senior Assistant Attorney General, Charleston, for Appellee.

Thomas W. Murtaugh, Union, for Appellant.

WORKMAN, Justice:

The defendant below and Appellant herein, Betty Jane Smith (hereinafter Appellant), appeals [1] the final order of the Circuit Court of Monroe County, entered on January 26, 1996, which amended the circuit court's prior order entered on June 30, 1995. In its June 30, 1995, order, the circuit court found Appellant not guilty by reason of mental illness, and it determined that, but for her mental illness, Appellant would be guilty of murder of the second degree. Therefore, the circuit court stated it would maintain jurisdiction over Appellant for forty years which the circuit court believed was the maximum sentence Appellant could receive for murder of

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

the second degree.[2] It further ordered Appellant be committed to Weston State Hospital or other facility selected by the Division of Health [3] for that time period or until the Division of Health makes a report that Appellant "is no longer a danger to herself or others and/or that her condition can be treated outside of a mental health facility with a plan of treatment and viable monitoring plan for such treatment." Additionally, the circuit court directed that a report be filed with the court on Appellant every six months by either the Division of Health or the commitment facility.

On appeal, Appellant raises three assignments of error.[4] First, Appellant argues the circuit court abused its discretion by continuing her case until after the amended version of West Virginia Code § 27–6A–3 (1992 & Supp.1996) [5] took effect. Second, Appellant asserts the circuit court violated the ex post facto provisions of Article I, Section 10 of the United States Constitution [6] and Article III, Section 4 of the West Virginia Constitution [7] by applying the amended statute. Third, Appellant argues the amended version of West Virginia Code § 27–6A–3 is unconstitutional.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On May 31, 1994, Appellant shot and killed her husband, Fred Smith. For several years before the killing, Appellant suffered from varying degrees of mental illness that resulted in hospitalization in 1990 at Roanoke Memorial Hospital in Virginia. In her discharge report from the hospital, Appellant was diagnosed with schizophreniform disor-

---

**2.** The order entered on January 26, 1996, amended the order dated June 30, 1995, only to the extent the circuit court stated it will maintain jurisdiction over Appellant for forty years. At the time of the offense, the maximum sentence for murder of the second degree was eighteen years, not forty. *See* W. Va.Code § 61–2–3 (1992 & Supp.1996) (providing the penalty for murder of the second degree). Therefore, the circuit court accordingly reduced the number of years it will maintain jurisdiction over Appellant to eighteen.

**3.** The former Department of Health was redesignated as the Division of Health pursuant to the Executive Reorganization Act of 1989. *See* Editor's notes to West Virginia Code § 27–1A (1992).

**4.** Appellant withdrew a fourth assignment of error because it became moot when the circuit court reduced the number of years it will maintain jurisdiction over her.

**5.** West Virginia Code § 27–6A–3 sets forth the procedures to be employed when a defendant is found not guilty by reason of mental illness. The 1974 version of this provision was in effect at the time Appellant killed her husband. This version states:

(a) The court of record may order that a person who has been found not guilty by reason of mental illness, mental retardation or addiction be hospitalized in a mental health facility for a period not to exceed forty days for observation and examination.

(b) During the observation period of a person found not guilty of any crime by reason of mental illness, mental retardation or addiction, procedures for civil commitment may be initiated before the court having jurisdiction pursu-

ant to article five [§ 27–5–1 et seq.] of this chapter.

(c) The prosecuting attorney of the county within which the alleged crime or crimes occurred shall be notified of any hearing conducted for a person under the provisions of this section or any subsequent hearing for such person within five years of the alleged crime conducted under the provisions of this chapter relating to the commitment of the mentally ill, mentally retarded or addicted and shall have a right to be heard at such hearings.

In 1995, the West Virginia Legislature entirely rewrote this section. The 1995 version of this statute applied to Appellant provides:

(a) After the entry of a judgment of not guilty by reason of mental illness, mental retardation or addiction, the court of record shall determine on the record the offense of which the person otherwise would have been convicted, and the maximum sentence he could have received. The court shall commit such defendant to a mental health facility under the jurisdiction of the department of health, with the court retaining jurisdiction over the defendant for the maximum sentence period.

(b) If the defendant is released from an inpatient mental health facility while under the jurisdiction of the court, the court may impose such conditions as are necessary to protect the safety of the public.

*Id.*

**6.** In relevant part, Section 10 provides: "No State shall ... pass any ... ex post facto Law...."

**7.** Section 4 states, in part: "No ... ex post facto law ... shall be passed."

der. On May 30, 1994, Mr. Smith took Appellant back to Roanoke Memorial Hospital for voluntarily admission to its rehabilitation facility for treatment of Appellant's mental illness. According to the hospital report, Mr. Smith apparently "became impatient with having to wait [and] took his wife home . . . ." Mr. Smith died the following day when Appellant, apparently in a delusional state, shot him at their house.

Following Appellant's arrest, the circuit court ordered her to undergo forensic evaluations. After reviewing the preliminary psychiatric report filed by Lee L. Neilan, M.D., and the psychological report filed by Robert W. Solomon, Ed.D., the circuit court entered an order on July 28, 1994, finding Appellant may be incompetent to stand trial and may not have been criminally responsible when the crime was committed. Therefore, the circuit court ordered Appellant to undergo hospitalization for up to six months with further independent evaluations and an improvement period related to her competency to stand trial and her ability to assist in her own defense. By order entered on February 9, 1995, the circuit court found Appellant was competent to stand trial.

By a report dated March 28, 1995, Dr. Neilan diagnosed Appellant with Bipolar Affective Disorder with Psychotic Features. Dr. Neilan stated Appellant relayed to him that she shot her husband because " '[s]omething told [her] there would be peace in the world if [she] killed him.' " (Emphasis deleted). Dr. Neilan opined Appellant is competent to stand trial but was not responsible at the time of the murder.

At a hearing held on April 17, 1995, the prosecuting attorney, Debra L. Dalton, apparently advised the circuit court off the record that the State did not believe it could prove the criminal intent necessary to get a conviction.[8] In light of the evidence, Appellant moved that a trial be held without a jury on May 2, 1995. The prosecuting attorney stated she could be prepared to handle the matter on that day. The circuit court took the motion under advisement, but said it would not decide the matter until it determined the status of the procedures to be employed when a defendant is found not guilty by reason of mental illness under West Virginia Code § 27–6A–3. The circuit court thought this statute recently was amended and believed the amended version of the statute would apply to Appellant.

By stipulation filed with the circuit court on April 26, 1995, Appellant and the prosecuting attorney agreed, inter alia, that Appellant committed the acts for which she was indicted, she did not commit the acts with malicious or criminal intent because of insanity, and, therefore, she was not responsible for the acts due to her mental illness. On its own motion, the circuit court entered an order on May 2, 1995, causing the case to be continued until May 19, 1995, because the circuit court had not procured a copy of the amended version of the statute.

A hearing was held on May 19, 1995, and the circuit court informed the parties that the purpose of the hearing was to have a status conference on what impact the amended statute would have on Appellant if she is found not guilty by reason of mental illness. The circuit court said it understood the amended version of the statute would go into effect on June 11, 1995, and believed the day the statute is applied to Appellant would control what version of the statute to use. The circuit court based this opinion, in part, on its belief that this statute is civil and not punitive in nature. The circuit court also said it was the intent of the West Virginia Legislature that the courts use the amended version to maintain jurisdiction over these types of cases. Appellant moved the circuit court either to resolve the matter against her forthwith or hold another hearing on June 5, 1995, to resolve it before the effective date of the amendment. The circuit court denied Appellant's motion and set the next hearing for a date after the amendment took effect. The circuit court noted Appellant's objection to this decision.

The hearing was held on June 30, 1996. Appellant moved the circuit court to apply

---

**8.** After a break in the hearing, Appellant's counsel stated on the record that "during . . . [the] break, the prosecuting attorney advised the Court that she didn't feel she could prove the criminal intent necessary to convict the defendant of murder . . . ."

the previous version of the statute. This motion was denied because of the reasons previously stated and because the circuit court did not consider the statute as punitive. Rather, the circuit court viewed the amended statute as a way to ensure Appellant would get the help and supervision she needed, which proved lacking under the previous version. At the close of the hearing, the circuit court found Appellant was not guilty by reason of mental illness and applied the 1995 version of the statute to her. On that same day, the circuit court entered an order reflecting its findings and its application of the amended version of the statute to Appellant.

Approximately six and one-half months later, by order entered January 17, 1996, Appellant was released from Sharpe State Hospital to live with her sister and participate in community-based treatment. However, this order contained a number of restrictions on Appellant, including that she must take all prescribed medications, shall submit at least once a month to blood testing and more if deemed appropriate, and shall attend "basic living skill's program and/or counseling" as directed. The circuit court also stated it should be advised of Appellant's status by written reports every six months and be made aware immediately of any behavior or conduct whereby Appellant is likely to endanger herself or others.

## II.

## DISCUSSION

### A.

### *Standard of Review*

◼ We first address Appellant's constitutional challenge to West Virginia Code § 27–6A–3. To the extent this issue presents purely a question of law and statutory interpretation, our review is plenary and de novo. *See State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 776, 461 S.E.2d 516, 522 (1995). In addition, we apply the abuse of discretion standard to

review the final order and the ultimate disposition by the circuit court, but we use the clearly erroneous standard when reviewing the circuit court's underlying factual finding. *Phillips v. Fox,* 193 W.Va. 657, 661, 458 S.E.2d 327, 331 (1995); *see also* Syl. Pt. 1, *Burnside v. Burnside,* 194 W.Va. 263, 460 S.E.2d 264 (1995).

### B.

### *Constitutional Challenge*

◼ Appellant generally complains that the procedure a circuit court must use to determine the length of time it retains jurisdiction over an insanity acquittee is unconstitutional because it bears no reasonable relationship to the mental illness suffered. To calculate the length of time a court may retain its jurisdiction in cases of acquittal by reason of mental illness, the court first must decide on the record what offense the acquittee "otherwise would have been convicted" and, then, determine the maximum sentence the acquittee "could have received" for that offense. W. Va.Code § 27–6A–3. Next, the court "shall commit" the acquittee "to a mental health facility under the jurisdiction of the department of health, with the court retaining jurisdiction over the defendant for the maximum sentence period." *Id.*

◼ In the present case, the circuit court concluded it may maintain its jurisdiction over Appellant for eighteen years—the maximum period of time she could have received upon conviction of second degree murder. Appellant claims this time period is arbitrary because it imposes infringements upon her liberty regardless of her mental condition. Therefore, she asserts it deprives her of due process and equal protection under the law. Upon review, we disagree for two reasons.

◼ First, although it is not mentioned by either Appellant or the State, the very next statute, West Virginia Code § 27–6A–4, goes directly to the heart of Appellant's argument.[9] The 1995 amendment to section four

---

9. In relevant part, section four provides:
 (b) The court may discharge a mentally ill ... defendant from the court's period of jurisdiction prior to the expiration of the period

specified in this section only when the court finds that the person is no longer mentally ill ... and that the person is no longer a danger to self or others. However, a defendant may

took effect simultaneously with the now challenged amended version of section three.[10] Section four gives the circuit court the authority to terminate its jurisdiction prior to the time period established by section three when the circuit court finds an acquittee is no longer mentally ill and poses no danger to self or others. Section four also provides, however, a circuit court may not release its jurisdiction if the acquittee's "mental illness is in remission solely as a result of medication or hospitalization or other mode of treatment if it can be determined within a reasonable degree of medical certainty that without continued therapy or hospitalization or other mode of treatment," the acquittee's mental illness will create a danger to the acquittee or others. Despite some restrictions, it is obvious from a fair reading of section four that a circuit court has the discretion to tailor its jurisdiction in conformance with the acquittee's mental condition. In addition, section four clearly gives the circuit court the power to terminate such jurisdiction upon a finding that a person acquitted by reason of mental illness "is no longer mentally ill ... and ... is no longer a danger to self or others." W. Va.Code § 27–6A–4. Accordingly, Appellant's argument that section three imposes an arbitrary term of jurisdiction must fail.

Moreover, a second reason we declare the jurisdictional criteria stated in section three do not violate Appellant's due process and equal protection rights is because section three, by its own terms, limits a circuit court's jurisdiction. Pursuant to section three, a circuit court cannot extend its jurisdiction indefinitely beyond the maximum sentence period the insanity acquittee "otherwise would have been convicted" of committing.[11] W. Va.Code § 27–6A–3. Nonetheless, Appellant essentially claims there is a fundamental problem with basing a circuit court's jurisdiction upon the maximum criminal sentence for an offense when there is no conviction. Appellant asserts this procedure violates her constitutional rights as stated by the United States Supreme Court in *Jones v. United States*, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).

In *Jones*, the petitioner was charged with attempted petit larceny for attempted shoplifting. *Id.* at 359, 103 S.Ct. at 3047. As a misdemeanor, this offense carried a maximum sentence of one year imprisonment. *Id.* The lower court accepted petitioner's plea of not guilty by reason of insanity and committed petitioner to a mental health hospital. Petitioner remained committed in the hospital after the expiration of the one year maximum sentence he could have received if he had been found guilty of the charged offense.[12] Consequently, petitioner filed an ac-

not be released from the jurisdiction of the court when the defendant's mental illness is in remission solely as a result of medication or hospitalization or other mode of treatment if it can be determined within a reasonable degree of medical certainty that without continued therapy or hospitalization or other mode of treatment, the defendant's mental illness will make him a danger to self or others.

 (c) Those persons committed under the provisions of this article may be released or discharged from the inpatient mental health facility only upon entry of an order from the court of record which committed the defendant finding that the defendant will not be a danger to self or others if so released, based upon the evidence introduced at the hearing.

W. Va.Code § 27–6A–4. We find the phrase "prior to the expiration of the period specified in this section" contained in subsection (b) refers back to subsection (a). *Id.* "[T]he period specified" in subsection (a) relates to the court's retention of jurisdiction found in West Virginia Code 27–6A–3. Subsection (a) generally states a civil commitment proceeding may be brought "[n]o later than thirty days prior to the release of

a defendant because of the expiration of the court's jurisdiction...." W. Va.Code § 27–6A–4.

**10.** *See* 1995 W. Va. Acts ch. 167 (passed on March 11, 1995, to take effect 90 days from passage).

**11.** If it is believed an acquittee's mental illness will continue to "cause[ ] the [acquittee] to be dangerous to self or others" beyond the maximum sentence period, civil commitment proceedings must be filed pursuant to this State's general civil commitment procedures contained within West Virginia Code § 27–5–1 to –10 (1992 & Supp.1996). W. Va.Code § 27–6A–4(a).

**12.** As indicated in the Honorable William J. Brennan's, Jr., Justice, dissent to *Jones*, the petitioner did not even dispute the fact that the Government could commit him for a definite period with respect to the maximum period of incarceration he could have received upon conviction. *Id.* at 372 n. 3, 103 S.Ct. at 3054 n. 3 (Brennan, J., dissenting). Moreover, the Honor-

tion demanding his unconditional release or his recommitment under the standards ensconced within the civil commitment statutes. *Id.* The lower court denied petitioner's requests. *Id.* at 360–61, 103 S.Ct. at 3047–48.

Writing for the majority, the Honorable Lewis F. Powell, Jr., Justice,[13] framed the question presented to the Court in terms of whether an individual who is acquitted by reason of insanity is entitled to be released from commitment if such commitment extends beyond the prison sentence the acquittee might have served if convicted.[14] *Id.* at 356, 103 S.Ct. at 3045–46. The Supreme Court determined due process " 'requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.' " *Id.* at 368, 103 S.Ct. at 3051 (quoting *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972)). In addition, the Supreme Court said the purpose of committing a person acquitted of an offense by reason of insanity, "like that of civil commitment, is to treat the individual's mental ill-

ness and protect him and society from his potential dangerousness." *Id.*

According to the Supreme Court in *Jones,* if a committed acquittee is found to be sane or no longer dangerous, the acquittee is entitled to be released. *Id.* (citing, in part, *O'Connor v. Donaldson,* 422 U.S. 563, 575–76, 95 S.Ct. 2486, 2493–94, 45 L.Ed.2d 396 (1975)[15]; other citations omitted). The Supreme Court recognized that, while a convicted criminal may be punished for a crime regardless of the criminal's potential to commit additional crimes, an insanity acquittee's confinement is based upon continuing mental illness and dangerousness. Moreover, an insanity acquittee may not be criminally punished because there is no conviction, and any criminal sentence that could have been imposed is irrelevant to the amount of time needed for recovery. *Id.* at 369, 103 S.Ct. at 3052. In conclusion, the Supreme Court ruled, inter alia, the confinement may last until the insanity acquittee "has regained his sanity or is no longer a danger to himself or society." *Id.* at 370, 103 S.Ct. at 3052–53.[16]

able John Paul Stevens, Justice, stated in his dissent that the majority opinion "lends support to the view that the *initial* confinement of the acquittee is permissible. . . ." *Id.* at 387, 103 S.Ct. at 3062 (Stevens, J., dissenting). *Cf. Humphrey v. Cady,* 405 U.S. 504, 510–11, 92 S.Ct. 1048, 1052–53, 31 L.Ed.2d 394 (1972) (indicating merit to argument that safeguards in civil commitment proceedings are not required when, pursuant to Wisconsin's Sex Crimes Act, initial commitment for compulsory treatment is in lieu of and limited in duration to maximum criminal sentence for convicted defendant). In the present case, however, Appellant is challenging the period of time prior to the expiration of the maximum period.

13. *Jones* was a 5–4 decision. Justice Powell was joined by the Honorable Warren E. Burger, Chief Justice, and the Honorable Byron R. White, William H. Rehnquist, and Sandra Day O'Connor, Justices. In his dissenting opinion, Justice Brennan, was joined by the Honorable Thurgood Marshall and Harry A. Blackmun, Justices. Justice Stevens filed a separate dissent.

14. In his dissent, Justice Brennan states the majority began its analysis by asking the wrong question. Justice Brennan believed the proper question to be addressed was whether the fact a person was acquitted "by reason of insanity, by itself, provides a constitutionally adequate basis for involuntary, indefinite commitment to psychiatric hospitalization." *Id.* at 371, 103 S.Ct. at

3053 (Brennan, J. dissenting) (internal quotation omitted).

15. In *O'Connor,* the Supreme Court said: "A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement." *Id.* at 575, 95 S.Ct. at 2493.

16. On appeal, the petitioner also complained that his commitment did not conform with the due process standards for civil commitment proceedings as the Supreme Court previously established in *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), because the judgment finding him not guilty by reason of insanity was based upon the preponderance of the evidence standard. *Id.* at 362, 103 S.Ct. at 3048. *See Addington,* 441 U.S. at 427, 99 S.Ct. at 1809 (concluding an "individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence"); *see also* Syl. Pt. 7, *State ex rel. Hawks v. Lazaro,* 157 W.Va. 417, 202 S.E.2d 109 (1974) (holding standard for involuntary commitment "is proof which is clear, cogent, and convincing"), *modified on other grounds State ex rel. White v. Todt,* 197 W.Va. 334, ―― n. 14, 475 S.E.2d 426, 439 n. 14 (1996). In response, the Supreme Court in *Jones* stated, however, that "[a] verdict of not guilty by reason of insanity

The Supreme Court found this decision comports with the view that an insanity acquittee falls within "a special class that should be treated differently from other candidates for commitment." *Id.* (footnote omitted).

More recently, in another split opinion,[17] the Supreme Court expounded upon the issue of whether a state can commit an insanity acquittee until such time as the acquittee can establish he or she is no longer dangerous—regardless of the fact he or she may no longer be insane. *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). The petitioner in *Foucha* was charged "with aggravated burglary and illegal discharge of a firearm." *Id.* at 73, 112 S.Ct. at 1782. Petitioner was found not guilty of these charges by reason of insanity and, subsequently, was institutionalized. Approximately three and one-half years later, a review panel recommended that the petitioner be conditionally released from the institution. In response, the trial judge ordered petitioner to be examined by two doctors. *Id.* at 74, 112 S.Ct. at 1782.

A hearing was held where one of the doctors testified the petitioner was in " 'good shape' mentally" but exhibited an antisocial personality.[18] *Id.* at 75, 112 S.Ct. at 1782–83. The doctor expressed that this condition was not a mental illness and was untreatable. The doctor further added he "would not feel comfortable in certifying that [the petitioner] would not be a danger to himself or to other people," as the petitioner was "involved in

several altercations" while institutionalized. *Id.* (citation and internal quotations omitted). Thereafter, the trial judge found the petitioner constituted a danger to himself and society and ruled the petitioner should remain committed in the mental institution. *Id.*

In part two of *Foucha,* the Supreme Court reiterated that, under *Jones,* a person acquitted by reason of insanity may be committed without meeting the standard for mental illness and dangerousness announced in *Addington.* *Id.* at 76, 112 S.Ct. at 1783; *see supra* note 16. However, when an insanity acquittee is no longer insane or dangerous, due process requires the acquittee either be released or be provided the additional constitutional protections afforded individuals under general civil commitment laws in order to justify any continued commitment. *Id.* at 77, 79, 112 S.Ct. at 1784, 1785. As in *Jones,* the Supreme Court stated the petitioner may not be punished for crimes when there is no conviction.[19] *Id.* at 80, 112 S.Ct. at 1785–86.

In part III of the opinion, the plurality said the petitioner's continued confinement also violated equal protection. After examining the law of the state in which petitioner was acquitted, the plurality found other persons, i.e., prisoners, who committed criminal offenses were not required to be confined until they could establish they were no longer dangerous. *Id.* at 85, 112 S.Ct. at 1788. Therefore, because these classes of people were treated differently, the plurality con-

establishes two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness." *Id.* at 363, 103 S.Ct. at 3049. According to the majority, this evidence is sufficient to commit an insanity acquittee for treatment and to protect the public's safety. *Id.* at 366, 103 S.Ct. at 3050–51. Therefore, the Supreme Court concluded by holding that the government may institutionalize a criminal defendant who proves "by a preponderance of the evidence that he is not guilty of a crime by reason of insanity...." *Id.* at 370, 103 S.Ct. at 3052.

**17.** The judgment of the Supreme Court was announced by Justice White, who also delivered the opinion of the Court with respect to Parts I and II, in which Justices Blackmun, Stevens, O'Connor, and the Honorable David H. Souter, Justice, joined. In Part III, Justice White was joined by Justices Blackmun, Stevens, and Souter. Justice

O'Connor filed a concurring opinion. The Honorable Anthony M. Kennedy, Justice, wrote a dissent and was joined by Chief Justice Rehnquist. The Honorable Clarence Thomas, Justice, also filed a dissenting opinion and was joined by the Chief Justice and the Honorable Antonin Scalia, Justice.

**18.** It was stipulated that both doctors would give similar testimony with respect to petitioner's condition. *Id.* at 75, 112 S.Ct. at 1782–83.

**19.** The majority distinguished this case from *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). *Id.* at 81, 112 S.Ct. at 1786. *Salerno* upheld a carefully and narrowly drawn statute permitting an arrestee to be subject to pretrial detention when "an arrestee presents an identified and articulable threat to an individual or the community...." 481 U.S. at 751, 107 S.Ct. at 2103.

cluded the law which permitted the petitioner to be committed indefinitely until he could prove he was no longer dangerous violated his equal protection rights.[20] *Id.*

In comparing the present case to the principles announced in both *Jones* and *Foucha*, we do not find any merit to Appellant's claim that the circuit court's jurisdiction over her violates due process and equal protection. A fundamental flaw with Appellant's entire argument is the fact that the circuit court *considered* her mental illness and released her from commitment to the custody of her sister—after only approximately six and one-half months passed from the date of her acquittal. In making its decision, the circuit court specifically found in its order entered on January 17, 1996, that Appellant *contin-ued to be* mentally ill, but her illness was in remission by the use of medication. Consequently, the circuit court narrowly tailored conditions for Appellant's release to meet the needs of both Appellant and society.[21] These conditions were in accord with a report and evaluation from the mental hospital where Appellant was committed.[22]

Upon review of this order, we fail to see how Appellant's current status violates the principles espoused by *Jones* and *Foucha*. Although in these cases "[t]he existence of mental [illness] and dangerousness appear to be *sine qua non* to the state's ability to confine an unconvicted defendant,"[23] Appellant continues to be mentally ill and, when she does not take her medication, she constitutes a danger to herself and others.[24] We

---

**20.** In her concurring opinion, Justice O'Connor mentioned that she did not believe the Supreme Court's opinion in *Foucha* rendered invalid laws such as those "limit[ing] the maximum duration of criminal commitment to reflect the acquittee's specific crimes and hold acquittees in facilities appropriate to their mental condition." *Id.* at 89, 112 S.Ct. at 1790 (statutory citations omitted).

In his dissent, Justice Kennedy states "[a] verdict of not guilty by reason of insanity is neither equivalent nor comparable to a verdict of not guilty standing alone." *Id.* at 94, 112 S.Ct. at 1793. Justice Kennedy asserts the majority essentially overrules *Jones* by treating *Foucha* as a civil case, rather than a criminal case. *Id.* According to Justice Kennedy, *Jones* recognized that criminal and civil commitments were distinguishable and required different due process considerations. *Id.* Justice Kennedy also mentions a fundamental difference exists between the insanity tests used in *Jones* and *Foucha*. In *Jones*, the petitioner was acquitted under the *Durham* test, while the petitioner in *Foucha* was acquitted under the *M'Naghten* rule. *Id.* at 98, 112 S.Ct. at 1795; *see Durham v. United States*, 94 U.S.App. D.C. 228, 240–41, 214 F.2d 862, 874–75 (1954); *M'Naghten's Case*, 10 Clark & Fin. 200, 8 Eng. Rep. 718 (1843).

In note four of *Foucha*, the majority dismisses Justice Kennedy's remarks about *Foucha* overruling *Jones* by explicitly stating "we do not question and fully accept that insanity acquittees may be initially held without complying with the procedures applicable to civil committees." 504 U.S. at 76 n. 4, 112 S.Ct. at 1799.

**21.** As previously mentioned, those conditions included requiring her to take her medication, submit to blood tests, "participate in basic living skills program and/or counseling" as directed, "participate in [a] treatment plan," and continue to reside with her sister unless Appellant receives prior approval from the circuit court to move.

The circuit court also ordered her to be monitored by her family, the probation office, and the FMRS mental health clinic with written reports to be filed every six months.

**22.** The "report and evaluation" were submitted on December 4, 1995, and consisted of a "three-month psychiatric evaluation" on Appellant and a report signed by Lydia P. Obleada, M.D. In the evaluation, Appellant was diagnosed with "Major Depression Recurrent without Psychotic Features." In her report, Dr. Obleada opined Appellant's "prognosis for ... staying mentally stable at home with her family is very good *since she is on the following medications ....*" (Emphasis added). Dr. Obleada also outlined a community-based plan for Appellant to follow if she is released to return to her family.

**23.** II Franklin D. Cleckley, Handbook on West Virginia Criminal Procedure at 117 (1993).

**24.** Pursuant to West Virginia Code § 27–6A–4(c), a court may not release an insanity acquittee from inpatient commitment unless a hearing is held and it is found on the record the acquittee is no longer a danger to self or others. At the time of the January 17, 1996, order, Appellant's mental illness was in remission as a result of taking medication. The circuit court specifically made this finding in its order, and, with respect to the conditions imposed upon Appellant, it is clear that the circuit court was concerned about the possible reoccurrence of both mental illness and dangerousness if Appellant fails to take her medication.

In the order itself, the circuit court requires the mental health clinic and/or Appellant's family to inform the circuit court at once of any behavior or conduct whereby Appellant "is likely to be a danger to herself or others...." Moreover,

do not mean to suggest that Appellant's conditional release does not infringe upon her liberty interests. Certainly, it does. *Cf. State ex rel. Rowe v. Ferguson,* 165 W.Va. 183, 185, 268 S.E.2d 45, 46 (1980) (quoting *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863–64, 43 L.Ed.2d 54 (1975), which stated "[e]ven pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty"); *Markey v. Wachtel,* 164 W.Va. 45, 55, 264 S.E.2d 437, 443 (1979) (recognizing "important liberty interest is involved in an involuntary commitment proceeding which requires substantial due process protection"). However, after reviewing the record and the orders in this case, we cannot say the circuit court abused its discretion by continuing its jurisdiction, nor can we say the circuit court was clearly erroneous in making its factual findings.

■ In sum, we conclude West Virginia Code §§ 27–6A–3 and –4, read in pari materia, generally provide a court flexibility in exercising and retaining its jurisdiction up to the maximum sentence period, with consider-

ation given to the current mental state and dangerousness of a person found not guilty by reason of mental illness. If not sooner terminated by the court, its jurisdiction automatically will expire at the end of the maximum sentence period. W. Va.Code § 27–6A–3. After the expiration of the maximum sentence period, a person found not guilty by reason of mental illness shall be either released or subject to civil commitment proceedings with all appurtenant rights thereto. W. Va.Code § 27–6A–4(a).[25]

In the present case, we find no reason to declare the circuit court violated Appellant's constitutional rights. By retaining its jurisdiction and by making Appellant's release from commitment conditioned upon narrowly tailored requirements to meet her mental-health needs, the circuit court is protecting both her and society. Moreover, if the circuit court determines at some point in the future that Appellant meets the criteria set forth in West Virginia Code § 27–6A–4, the circuit court may release Appellant from its jurisdiction.[26]

the link between Appellant's mental illness and dangerousness is evidenced by the fact she, approximately one and one-half years earlier, shot her husband believing it would bring about world peace. In addition, at the hearing held on June 30, 1996, Appellant's brother testified that, after Appellant's initial hospitalization for mental illness in 1990, she was "a whole lot better" but "she didn't follow-up on what the doctors—she quit taking her medicine and stuff, she got back in the same shape she was in, maybe even worse."

As an aside, we notice West Virginia Code § 27–6A–4(b) in its current form uses the phrase "[t]he court may discharge a mentally ill … defendant from the court's period of jurisdiction prior to the expiration of the period … only when the court finds that the person is no longer mentally ill … *and* that the person is no longer a danger to self or others." (Emphasis added). *Id.; see also* W. Va.Code § 27–6A–4(c). On the other hand, the United States Supreme Court in both *Jones* and *Foucha* have said an "acquittee is entitled to release when he has recovered his sanity *or* is no longer dangerous." *Jones,* 463 U.S. at 368, 103 S.Ct. at 3052 (emphasis added); *Foucha,* 504 U.S. at 77, 112 S.Ct. at 1784 (quoting *Jones* and further stating "the acquittee may be held as long as he is both mentally ill and dangerous, but no longer"). In the present case, Appellant is no longer committed to a hospital and the balance between her liberty interest and society's interest is much different than if she had remained committed. Moreover, as a prac-

tical matter, Appellant still falls within the mentally ill and dangerous categories because her mental illness and historically-associated dangerousness are in remission only as a result of medication. Given the seriousness of the offense Appellant recently committed, society has a strong interest in ensuring Appellant takes her medicine and she receives the other care she needs upon her release. Therefore, because it is not relevant in this case, we express no opinion about what impact the use of the word "and" may have on cases wherein an acquittee, who is not both mentally ill and dangerous, seeks release from commitment *prior* to the expiration of the maximum sentence period.

**25.** *Cf. Baxstrom v. Herold,* 383 U.S. 107, 110, 86 S.Ct. 760, 762, 15 L.Ed.2d 620 (1966) (stating at expiration of petitioner's prison term he was denied equal protection by not being afforded a jury trial or a "judicial determination … he is dangerously mentally ill" as provided to other candidates of civil commitments).

**26.** To the extent they are not relevant in the present case, we do not address the sundry of hypothetical constitutional violations Appellant suggests might arise under West Virginia Code § 27–6A–3. *See generally State ex rel. Billings v. Point Pleasant,* 194 W.Va. 301, 304 n. 5, 460 S.E.2d 436, 439 n. 5 (1995) (refusing to address additional constitutional concerns of relator because relator lacked standing to raise those concerns).

## C.

### Ex Post Facto

In a very cursory manner, Appellant argues the circuit court violated the ex post facto provisions of the state and federal constitutions when it applied the amended version of West Virginia Code § 27–6A–3.[27] We find Appellant's argument lacks merit.

In syllabus point one of *Adkins v. Bordenkircher*, 164 W.Va. 292, 262 S.E.2d 885 (1980), we explained:

> Under *ex post facto* principles of the United States and West Virginia Constitutions, a law passed after the commission of an offense which increases the punishment, lengthens the sentence or operates to the detriment of the accused, cannot be applied to him.

In *State v. R.H.*, 166 W.Va. 280, 273 S.E.2d 578 (1980), *overruled on other grounds, State ex rel. Cook v. Helms*, 170 W.Va. 200, 292 S.E.2d 610 (1981), we also adopted the classic definition of an ex post facto law as stated by the United States Supreme Court in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798):

> "(1) Every law that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action; (2) every law that aggravates a crime, or makes it greater than it was when committed; (3) every law that changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed; (4) every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the com-

mission of the offense, in order to convict the offender."

166 W.Va. at 288–89, 273 S.E.2d at 583–84 (quoting 3 U.S. (3 Dall.) at 390, 1 L.Ed. at 650). A fundamental principle of ex post facto law is that it only applies to criminal proceedings, not civil. *Shumate v. West Virginia Department of Motor Vehicles*, 182 W.Va. 810, 814 n. 4, 392 S.E.2d 701, 705 n. 4 (1990). While it is true West Virginia Code § 27–6A–3 was enacted after Appellant committed the offense for which she was found not guilty by reason of mental illness, we find her acquittal was rendered after the amendment took effect and it removed the case from the criminal arena.

The purpose of a commitment statute is not to punish someone suffering a mental illness; rather, it is to treat the illness and protect society. If someone is found not guilty by reason of mental illness, there is no conviction to warrant a punishment. *Foucha*, 504 U.S. at 80, 112 S.Ct. at 1785–86; *Jones*, 463 U.S. at 369, 103 S.Ct. at 3052; *see also State ex rel. White v. Todt*, 197 W.Va. 334, 340, 475 S.E.2d 426, 432 (1996) (recognizing civil commitment proceeding different than criminal prosecution).[28] Consequently, ex post facto principles typically are not invoked by the commitment of an insanity acquittee. Our research on this issue demonstrates other jurisdictions have reached similar conclusions. *See People v. Superior Court (Williams)*, 233 Cal.App.3d 477, 284 Cal.Rptr. 601, 608 (1991) (stating "ex post facto principles are not applicable to [commitment] extension proceedings"); *Payne v. Fairfield Hills Hosp.*, 215 Conn. 675, 578 A.2d 1025, 1029 (1990) (finding "[a]s a general matter, the confinement of insanity

**27.** Article I, Section 10 of the United States Constitution provides in relevant part: "No State shall ... pass any ... ex post facto Law...." Article III, Section 4 of the West Virginia Constitution, in pertinent part, states: "No ... ex post facto law ... shall be passed."

**28.** In *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), the Supreme Court explained it is important to look at the purpose of a statute in determining whether it is penal or not. *Id.* at 96, 78 S.Ct. at 595–96. "If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc.—it has been considered penal.

But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose." *Id.* (footnotes omitted). Some statutes that impose adverse consequences for certain conduct encompass both penal and nonpenal effects. To determine the nature of these statutes, evident legislative purposes normally control. *Id.* Relevant to any decision with respect to whether a statute is penal or not is "the severity of the disability imposed as well as all the circumstances surrounding the legislative enactment...." *Id.* at 97 n. 18, 78 S.Ct. at 596 n. 18.

acquittees, although resulting initially from an adjudication in the criminal justice system, is not 'punishment' for a crime"); *but see Anderson v. Dept. of Health and Mental Hyg.*, 310 Md. 217, 528 A.2d 904, 910–11 (1987) (concluding insanity acquittee committed to a maximum security hospital implicates ex post facto principles), *cert. denied sub nom. Maryland v. Anderson*, 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988).

In addition, we find it is of no consequence for ex post facto analysis that the maximum period of time a circuit court may retain jurisdiction over an insanity acquittee is related to the maximum criminal sentence. In fact, this jurisdictional limit prevents insanity acquittees from receiving indefinite commitments while their criminal counterparts are set free. *Cf. Foucha*, 504 U.S. at 85, 112 S.Ct. at 1788 (comparing criminal incarcerations to insanity commitments for purposes of equal protection).

For these reasons, we conclude the circuit court's implementation of the amended version of West Virginia Code § 27–6A–3 did not violate ex post facto principles.

### D.

### *The Propriety of the Circuit Court Continuing Appellant's Hearings*

Finally, Appellant argues the trial court abused its discretion by continuing her hearings in order to obtain a copy of the new legislation and by refusing to hold a bench trial until after the amendment to West Virginia Code § 27–6A–3 took effect. Appellant states that as early as the hearing held on April 17, 1995, the circuit court was aware of the prosecuting attorney's concession that she could not prove criminal intent due to Appellant's mental illness. In addition, the prosecuting attorney stated she could be ready to try the case on May 2, 1995. This concession was followed by a written stipulation between the parties that Appellant committed the acts, but she was not criminally responsible for her actions at the time. Appellant asserts the circuit court continued the matter on its own motion in order to obtain a copy of the new legislation without regard to

the fact the case was ripe for a decision. At the next hearing on May 19, 1995, Appellant states her case was unduly delayed and she suffered irreparable harm when the circuit court decided to wait to resolve the case until after the effective date of the amendment, thereby, subjecting her to a more restrictive statute.

 Repeatedly, we have said: "It is well settled as a general rule that the question of continuance is in the sound discretion of the trial court, which will not be reviewed by the appellate court, except in case it clearly appears that such discretion has been abused. Syl. Pt. 1, *Levy v. Scottish Union & Nat. Insurance Co.*, 58 W.Va. 546, 52 S.E. 449 (1905)." Syl. Pt. 2, *Nutter v. Maynard*, 183 W.Va. 247, 395 S.E.2d 491 (1990). Upon reviewing the record in this case, we find it apparent that the circuit court did not abuse its discretion by continuing the case at least up to the point of May 19, 1995. Prior to that time, the circuit court believed West Virginia Code § 27–6A–3 was amended and was "probably in effect," however, the circuit court was unsure what the amendment provided. It would be ludicrous for this Court to find under these facts that the circuit court abused its discretion by continuing the case in order to acquire a copy of the amended version of the statute to see if it applied. Obviously, knowing what the law provides is *sine qua non* with applying it.

 We also find the circuit court did not abuse its discretion when it refused to resolve the matter at the May 19, 1995, hearing. Although by then the circuit court had acquired a copy of the amended statute, the hearing was scheduled as a status conference, and the prosecuting attorney claimed she first received notice on the same day as the hearing that the Appellant desired to have the matter immediately resolved. Consequently, she said she did not have the opportunity to notify the victim's family. Given these concerns, the circuit court did not abuse its discretion by refusing to make its final determination on that day. Therefore, the only remaining issue is whether the circuit court abused its discretion by holding the next hearing after the amendment took effect.

Appellant moved the circuit court at the May hearing to decide the case prior to the time the amendment would take effect. The circuit court denied this motion and said it "wants to make the record very clear the Court feels the legislature wants us to follow the new law, and the Court intends to follow the new law." The circuit court informed Appellant it would reconsider its decision if Appellant could show authority to the contrary. However, the circuit court believed applying the old statute to Appellant would result in "a grave injustice" to Appellant, her family, and everyone concerned because, if Appellant was ever released from confinement, the circuit court would not have the flexibility it now has under the statute to maintain its jurisdiction and supervise her to ensure she takes her medication.[29] The final hearing subsequently was held after the amendment took effect.

In light of the civil nature of this statute and its purpose of rendering treatment and care to the Appellant, while protecting society from her demonstrated, delusional-violent behavior, we cannot say the circuit court abused its discretion by considering Appel-

lant's situation with respect to the purpose of the new statute. Accordingly, we find no error by the circuit court's continuance of the case.

## III.

## CONCLUSION

For the foregoing reasons, we hold West Virginia Code §§ 27–6A–3 and –4 did not violate Appellant's constitutional rights, the application of the statutes to Appellant did not violate ex post facto prohibitions, and the circuit court did not abuse its discretion when it continued Appellant's hearings. Therefore, the final order of the Circuit Court of Monroe County is affirmed.

Affirmed.

---

**29.** Likewise, less than one year prior to the amendments at issue today, the circuit court's concern was addressed by a dissent to this Court's opinion in *State v. Walls*, 191 W.Va. 332, 445 S.E.2d 515 (1994), where the dissent said:

Inherent in any involuntary commitment is the potential for release upon demonstration of mental condition which evidences to the treating psychiatrist that the defendant is no longer a danger to either himself or society. Where criminal defendants found not guilty by reason of insanity are concerned, standards should be developed, legislatively or otherwise, which ensure that releases are made only under extremely cautious criteria. All too often, upon release, such an individual returns to society, and either because he refuses to take the medication necessary to control his psychotic tendencies or for other reasons, commits another violent crime. For these reasons, stringent conditions should be imposed upon the release of such an individual.

*Id.* at 337–38, 445 S.E.2d at 520–21 (Workman, J., dissenting).