**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**STATE OF WEST VIRGINIA,**

**Plaintiff Below, Respondent**

**FILED**

**October 13, 2016**

**released at 3:00 p.m.**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs) No. 15-0876** (Raleigh County 94-F-330)

**CHIP MELTON DAVIDOW,**

**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Chip Melton Davidow (hereinafter "petitioner"), by counsel, Maryl C. Sattler, appeals the Circuit Court of Raleigh County's August 5, 2015, order denying his motion for order directing transfer to less restrictive placement. Petitioner, who was found not guilty of first degree murder by reason of insanity in 1996, had been successfully placed at his own expense in a Massachusetts psychiatric program for approximately twenty years, where he lived in a group home. Upon its closure, the circuit court ordered petitioner returned to West Virginia whereupon he was placed at Sharpe Hospital, then transferred to Highland Hospital, a secured psychiatric facility. Petitioner moved for a less restrictive placement and the circuit court found that petitioner was not entitled to a transfer to a similar program in Massachusetts inasmuch as West Virginia maintains adequate, similar facilities and programs enabling petitioner to be placed in the "least restrictive" environment which would also allow for protection of the public. The State, by counsel, David A. Stackpole, filed a response in support of the circuit court's findings.

This Court has considered the parties' briefs, oral arguments, and the appendix record on appeal. Under the limited circumstances presented in this case, we find a memorandum decision reversing the circuit court and remanding for further proceedings appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure. As explained below, we conclude that the circuit court's order failed to properly reach the issue of whether petitioner is currently placed in the "least restrictive" environment which allows for protection of the public and therefore reverse and remand for further proceedings as necessary and entry of an order consistent herewith.

## I. FACTUAL AND PROCEDURAL HISTORY

On June 23, 1994, petitioner murdered a truck driver after suffering a psychotic episode during which he believed J. Edgar Hoover told him to assassinate a man in a panel truck.

1

He forced the victim's truck off the road and shot and stabbed him numerous times, believing the victim was a "quick healer." Upon psychiatric evaluation, petitioner was determined to be suffering from paranoid schizophrenia.[1] During the pendency of the underlying criminal proceedings, petitioner was transferred to Bournewood Hospital in Brookline, Massachusetts upon motion of defense counsel and with the agreement of the State, for a "clinical setting evaluation and psychiatric care[.]" Shortly thereafter, an agreed order transferred petitioner to Wild Acre Inns (hereinafter "Wild Acre") in Lexington, Massachusetts; the order indicated only that petitioner's counsel had received a request from Bournewood that petitioner be transferred to Wild Acre.

On December 23, 1996, the circuit court found petitioner not criminally responsible for first degree murder, committing him to "a mental health facility within or without this state for a period equal to the maximum sentence allowable," For the next eighteen years, only two notable events occurred in the criminal case. First, in 1999, the court granted petitioner permission to travel to Washington, D. C. with a chaperone for his mother's funeral. More notably, in 2000, an order for transport and commitment to Sharpe Hospital was entered, noting that Wild Acre was "no longer available."[2] The order curiously ordered Wild Acre to transport petitioner "insofar as they are willing to do so[.]" However, it is clear from the record that all parties agree this order was never disseminated to Wild Acre.

For the next approximate eighteen years, petitioner continued to be housed and treated at Wild Acre, at his own expense. He advanced through Wild Acre's stepdown procedures, ultimately winding up in a staffed, group home with daily monitoring.[3] In particular, this level of placement allowed him to participate in a therapeutic music group known as "Tunefoolery," a group comprised of individuals with mental health issues. The record appears

---

[1] A psychological evaluation conducted by Dr. David Clayman shortly after the crime occurred recommended that petitioner "be hospitalized for as long as permitted by the law to protect society, because it is likely he could cause harm again if he should stop his medication[.]" An evaluation by Dr. Russell Voltin shortly thereafter stated that he "[did] not feel that Mr. Davidow will ever be safe to release into society" and should "remain in psychiatric care in an inpatient hospital setting, preferably, a forensic unit for the criminally insane."

[2] There is no indication in the record what may have prompted this order or the basis of the order's statement that Wild Acre was "no longer available[.]" That facility did not close until 2014.

[3] Petitioner's program indicates that he lived in a group home a short walk from the clinical facility and walked there daily for medications and a mental status exam. He provided a daily schedule and was monitored for adherence, checking in upon departure and return. He participated in a day program, the music group/program "Tunefoolery," was escorted to his psychiatric appointments, the grocery store, and attended one therapeutic group weekly.

clear that during this time, petitioner was medication-compliant, cooperative, trustworthy, and had suffered no relapses of psychotic episodes.[4]

In August, 2014, the circuit court was informed that Wild Acre was closing its Lexington facility where petitioner was housed; a sister campus of Wild Acre located in Belmont, Massachusetts, however, was to remain open under new ownership. The court conducted a hearing and heard from petitioner's psychiatrist, Dr. Kantar, and Wild Acre Belmont's (hereinafter "Belmont") new owner, John Sciretta, indicating that petitioner was suitable for placement in the Belmont facility. Nevertheless, the circuit court ordered petitioner immediately transferred to Sharpe Hospital, a secure psychiatric facility, for evaluation and a determination of the proper placement in light of Wild Acre's closure. Petitioner was transferred to Sharpe Hospital on September 14, 2014. On November 3, 2014, he was transferred from Sharpe to Highland Hospital in Clarksburg, for reasons that do not appear from the record. The Statewide Forensic Coordinator, Georgette Bradstreet (hereinafter "Ms. Bradstreet") wrote to the court and advised that "there is no distinction between Sharpe and Highland Hospitals in so far as security and safety precautions. Both facilities maintain patients on a secure locked unit."[5]

On May 4, 2015, petitioner moved for a transfer to a less restrictive placement, namely, Belmont. Petitioner argued that the twenty-year freedom of movement and relative independent living he enjoyed at Wild Acre had been replaced with what was tantamount to a maximum security prison. The State presented testimony from Ms. Bradstreet, who testified that West Virginia was well-equipped to provide petitioner with the least restrictive placement, having many group homes or community placement programs to offer. She noted, however, that petitioner would have to work his way through the stepdown process to earn the right to such placements. Petitioner presented documentation from Belmont's new owner which included a treatment plan providing for continuity of providers and care, with a couple of enhancements and characterized the change as one of "real estate" rather than care. Petitioner further presented a report by retained psychologist Dr. Saar, who indicated that petitioner presented a low probability of violence, a low risk to the community, and that the "ideal setting" for petitioner's care would be at Belmont.

The circuit court denied petitioner's motion on August 5, 2015. The court characterized petitioner's motion as one to choose his own placement, rather than one for a transfer to a less restrictive placement. The court noted that although it had the authority to order out of state placement, such was unnecessary as West Virginia could provide petitioner with placement which was the least restrictive with due regard for public safety. The court further noted the practical inefficacies which would be borne by the DHHR and the court with petitioner out of its jurisdiction. The court concluded by stating that it was "quietly horrified to learn that Mr. Davidow was, in essence, returned to the general population" and that to "allow acquittees to

---

[4] Psychiatric evaluations conducted in 2014 and 2015 indicate that petitioner's schizophrenia is in long-term remission and that his prior episodes were related to substance abuse and absence of medication.

[5] Ms. Bradstreet, however, appeared to reverse course during the hearing while advocating that petitioner remain at Highland, testifying that "moving to Highland Hospital is a step down, so to speak, of a lesser secured facility than even what Sharpe Hospital is."

designate their own placements is a highly questionable practice, very much akin to letting the tail wag the dog." The court noted it was unwilling to assume further risk by allowing petitioner to return to his "unrestricted lifestyle[.]" This appeal followed.

## II. STANDARD OF REVIEW

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 2, *Walker v. West Virginia Ethics Comm'n*, 201 W. Va. 108, 492 S.E.2d 167 (1997). More pointedly, "both by statute and case law, a trial court has broad discretion to determine the appropriate disposition of those found not guilty by reason of insanity." *State v. Catlett*, 207 W. Va. 740, 745, 536 S.E.2d 721, 726 (1999). We are mindful, however, "[t]he purpose of West Virginia Code § 27-6A-3 (Supp. 1996) is not to punish someone suffering a mental illness; rather, it is to treat the illness and protect society. If someone is found not guilty by reason of mental illness, there is no conviction to warrant a punishment. . . ." Syl. Pt. 4, in part, *State v. Smith*, 198 W. Va. 702, 482 S.E.2d 687 (1996). With these standards in mind, we turn to petitioner's assignments of error.

## III. DISCUSSION

Petitioner first argues that the circuit court erred in refusing to transfer him to Belmont, which he contends is the "least restrictive placement" available to him. West Virginia Code § 27-6A-4(e) (2007) provides that when a defendant has been found not guilty by reason of mental illness, "[t]he court shall commit the acquitee to a mental health facility designated by the department *that is the least restrictive environment to manage the acquitee and that will allow for the protection of the public.*"[6] (emphasis added).

---

[6] At the time of petitioner's original commitment, West Virginia Code § 27-6A-3 (1995) governed commitment of persons found not guilty by reason of mental illness and provided:

> After the entry of a judgment of not guilty by reason of mental illness, mental retardation or addiction, the court of record shall determine on the record the offense of which the person otherwise would have been convicted, and the maximum sentence he could have received. *The court shall commit such defendant to a mental health facility under the jurisdiction of the department of health,*

In support of this assignment of error, petitioner argues that because he ostensibly flourished at Wild Acre, its successor facility, Belmont, is necessarily the "least restrictive" placement and he is therefore entitled to be placed there pursuant to the statute. We note first that petitioner minimizes the commensurate, equally critical statutory requirement that any such placement must likewise "allow for protection of the public." W. Va. Code § 27-6A-4(e). It is plain that the circuit court was extremely concerned that the reduced level of supervision petitioner enjoyed at Wild Acre was at odds with both the severity of petitioner's crime and the opinions of at least two evaluating mental health professionals, who examined petitioner close in time to his offense. The circuit court expressed reluctance to "assume further risk . . . by reinstating this acquitee to the unrestricted lifestyle that he enjoyed in Massachusetts." The circuit court, in the use of its considerable discretion, was clearly dissatisfied with petitioner's previous level of freedom at Wild Acre relative to the second statutory requirement that any placement must be consistent with the ends of public safety.

More to the point, however, simply because petitioner purportedly did well at Wild Acre does not make it or a companion facility the only available environment which satisfies the statutory criteria. Petitioner presents no authority supporting his contention that he is entitled to out-of-state placement, regardless of his history of such placement.[7] While the Interstate Compact on Mental Health, W. Va. Code § 27-14-1 *et seq.*, *permits* participating states to place mentally ill persons in facilities out-of-state, there is certainly nothing that *requires* out-of-state placement, particularly when there are adequate facilities in-state. *Compare State v. Robertson,* 230 W. Va. 548, 741 S.E.2d 106 (2013) (affirming circuit court's placement of acquitee in out-of-state facility where no in-state facility provided adequate level of security). Ms. Bradstreet testified, generally, that there were similar group home and community placement programs available to petitioner in West Virginia.[8] Petitioner provided no contradictory

---

*with the court retaining jurisdiction over the defendant for the maximum sentence period.*

(emphasis added).

[7] We are equally unpersuaded that petitioner's offer to personally pay the expense of his out-of-state placement affects the analysis required under West Virginia Code § 27-6A-4(e) in this particular case. Given the circuit court's broad discretion in disposition, we cannot say that an acquitee bearing some or all of the costs of an out-of-state placement would never be permissible. However, the relative wealth or ability of an acquitee to bear such costs may obviously *not* factor into the determination of whether he or she is placed in the least restrictive environment consistent with public safety, as required.

[8] Petitioner further argues that the circuit court erred by placing too much emphasis on Ms. Bradstreet's testimony since she had only reviewed the psychiatric evaluations conducted shortly after the crime, rather than petitioner's more recent reports regarding his current dangerousness risk and level of function. However, the circuit court's order cites only to Ms. Bradstreet's testimony about the availability of various placement options, which were not tied in any way to petitioner's particular psychiatric evaluations. In other words, Ms. Bradstreet testified about the continuum of placement options available generally to acquitees such as petitioner and the

testimony indicating that West Virginia had no such alternatives or that the options described by Ms. Bradstreet were inappropriately restrictive.[9] The absence of any such testimony, along with the circuit court's well-articulated concerns about the commensurate requirement that the public be adequately protected, makes petitioner's position that only Belmont provides a statutorily-compliant placement unavailing. We therefore find that the circuit court committed no reversible error in rejecting petitioner's demand for transfer to Belmont.

Petitioner next argues that the circuit court erred by failing to make findings regarding whether—petitioner's preferred placement aside—his current environment at Highland Hospital is the "least restrictive alternative." Although we again note petitioner's inadequate veneration of the public safety criteria contained in West Virginia Code § 27-6A-4(e), upon scrutiny of the circuit court's order, we agree that it fails to contain findings that petitioner's placement at the time of the proceedings below was statutorily-compliant. The circuit court's order makes no findings about petitioner's environment as pertains to his previous level of restriction and his current psychiatric status, such as to determine whether he is placed in the least restrictive environment which is consistent with protection of the public. Rather, the circuit court's order focuses nearly exclusively on the propriety of petitioner's requested transfer to Belmont. In fact, the circuit court's order suggests this was intentional, stating that although petitioner's motion was "styled as a motion to transfer this acquitee to a less restrictive placement, it is actually a motion to have the defendant placed in a specific, pre-selected, private facility which happens to be situate 750 miles away." Without question, petitioner argued strenuously below, as he does before this Court, that the "least restrictive placement" is in fact Belmont. However, petitioner's motion clearly challenged and addressed the level of restriction to which petitioner is subjected at Highland Hospital and sought a less restrictive environment. Moreover, during oral argument, the State conceded that remand would be appropriate for more specific findings regarding petitioner's current level of restriction, the basis for such level of restriction, and his placement plan going forward.

Accordingly, we find it appropriate to reverse the circuit court's denial of petitioner's motion for transfer to less restrictive placement and remand for additional findings regarding whether petitioner is presently in the least restrictive environment which will allow for public safety. Given the pendency of this appeal, petitioner has now been at Highland Hospital for approximately two years; his most recent assessment indicates he continues to progress toward lesser restrictions. Therefore, to whatever extent additional evidence is necessary to allow the circuit court to ascertain the nature of petitioner's current placement and evaluate the

process of progressing through the continuum, rather than testifying about where he should be specifically placed given his current psychiatric status.

[9] On this issue, petitioner offered only the written report of Dr. Saar, who summarily opined that West Virginia had a "paucity of resources" for individuals such as petitioner, given that the majority of programs were designed for developmentally delayed or mentally handicapped adults. His report did not, however, indicate that there were absolutely no such resources available.

6

appropriateness thereof in light of the public safety concerns, the circuit court may conduct additional proceedings as needed.[10]

## IV. CONCLUSION

For the reasons set forth above, this Court reverses the August 5, 2015, order of the Circuit Court of Raleigh County and remands for further proceedings as appropriate.

Reversed and remanded with instructions.

**ISSUED:** October 13, 2016

**CONCURRED IN BY:**

Chief Justice Menis E. Ketchum
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Allen H. Loughry II
Senior Status Judge Thomas E. McHugh, sitting by special assignment.

Justice Benjamin, deeming himself disqualified, did not participate in this decision.

---

[10] Moreover, this memorandum decision should not be construed as foreclosing the circuit court from hereinafter ordering petitioner to an out-of-state placement.